[No. A124358. First Dist., Div. Two. Oct. 20, 2010.]

THE PEOPLE, Plaintiff and Appellant, v.
FRANK EVAN POWERS-MONACHELLO et al., Defendants and
Respondents.

## Counsel

Stephan R. Passalacqua, District Attorney, Robert A. Maddock, William S. Mount and Andrew S. Lukas, Deputy District Attorneys, for Plaintiff and Appellant.

Stephen M. Gallenson, under appointment by the Court of Appeal, for Defendant and Respondent Frank Powers-Monachello.

Patricia Lea Brisbois, under appointment by the Court of Appeal, for Defendant and Respondent Dan Edward Scheiner.

Steven Samuel Lubliner, under appointment by the Court of Appeal, for Defendant and Respondent Dana Deniell Gearardo-Scheiner.

## Opinion

**LAMBDEN, J.**—Defendants in this case were charged with possession for sale of cocaine and conspiracy to possess cocaine for sale. The Sonoma County District Attorney contends that two different trial judges misapplied the governing law regarding the corpus delicti rule in dismissing the conspiracy count. Appellant urges us to hold that the corpus delicti rule's limitation on the use of defendants' extrajudicial statements has been eliminated from the preliminary examination stage of criminal proceedings. However, we conclude that although defendants' statements might have been

introduced to determine whether they would be held to answer, such statements remained irrelevant until the corpus delicti rule had been otherwise satisfied. Our Supreme Court has not understood the 1982 constitutional amendment at the center of appellant's argument to have fully abrogated the rule requiring independent evidence of the alleged crime. We agree with that conclusion. In the preliminary examination stage of criminal proceedings, the application of the classical corpus delicti rule in California remains unabated.

## BACKGROUND

Beginning in May 2007, Santa Rosa Police Department detectives conducted an elaborate investigation of respondent Frank Evan Powers-Monachello (Powers), whom they suspected of dealing large amounts of cocaine in Sonoma County. Surveillance of Powers extended over several months and more than one county: at times, tracking devices were attached to his car, he was observed interacting with the other defendants on several occasions, and he was seen frequently at the home of two codefendants where a safe was ultimately found to contain a large amount of cocaine. Powers had the key to the safe and regularly provided cocaine to the other defendants.

Powers and three codefendants[1] were charged by a complaint with four felony counts: (1) conspiracy to possess cocaine for sale (Pen. Code, § 182, subd. (a)(1));[2] (2) possession of cocaine for sale (Health & Saf. Code, § 11351); (3) cultivation of marijuana (Health & Saf. Code, § 11358); and (4) possession of marijuana for sale (Health & Saf. Code, § 11359).

The information alleged 10 facts to support the conspiracy charge:

"1. [Powers] drives out of county on several occasions.

"2. Upon his return to the county, Powers immediately goes to 1109 Copeland Creek Drive, Rohnert Park.

"3. 1109 Copeland Creek Drive is owned/occupied by [Scheiner] and [Gearardo].

---

[1] Two of the original codefendants, Dan Edward Scheiner (Scheiner) and Dana Deniell Gearardo-Scheiner (Gearardo), who lived at the house where the safe was located, also appealed from the trial court's Penal Code section 995 finding of probable cause, but later abandoned their appeal after negotiating dispositions of the charges against them. A third original defendant, Ryan James Floyd, was never a party to this appeal.

[2] All further statutory references are to the Penal Code unless otherwise noted.

"4. Powers stores a safe at 1109 Copeland Creek Drive, in exchange he provided approximately 3.5 grams of cocaine per day to Scheiner and Gearardo.

"5. Powers possessed the key to the above described safe.

"6. Powers arrives almost daily to access or store cocaine in the safe at 1109 Copeland Creek Drive.

"7. [Floyd] arrived at 1109 Copeland Creek Drive, when Scheiner and Powers were present.

"8. Powers provides cocaine to Floyd.

"9. Powers gave Floyd two small boxes.

"10. Floyd loaded the boxes into his car and drove away."

At the two-day preliminary hearing in August 2008, Sonoma County Superior Court Judge Elliot Daum found probable cause for the possession charges, but dismissed the conspiracy charge for failure to satisfy the corpus delicti rule.

The prosecutor promptly filed a new, but essentially identical, four-count information alleging the same conspiracy charge that Judge Daum had dismissed. Powers again moved under section 995 to dismiss the conspiracy charge on the ground that the prosecution had not produced evidence to satisfy the corpus delicti rule. After reviewing the entire transcript of the prior preliminary hearing and further briefing and argument, Judge Kenneth Gnoss granted Powers's motion and dismissed the conspiracy charge as to all four defendants as follows: "[T]here [was] insufficient, independent evidence presented at the preliminary hearing to establish an agreement or a conspiracy . . . the [defendants'] statements should not be introduced."

The Sonoma County District Attorney[3] filed this timely appeal.

## DISCUSSION

█ The corpus delicti rule provides that " '[i]n every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself— i.e., the fact of the injury, loss, or harm, and the existence of a criminal

---

[3] The Sonoma County District Attorney is not represented by the Attorney General.

agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendants. [Citations.]' [Citation.] This includes 'preoffense statements of later intent as well as . . . postoffense admissions and confessions.' " (*People v. Miranda* (2008) 161 Cal.App.4th 98, 107 [73 Cal.Rptr.3d 759].)

" ' "The corpus delicti rule was established by the courts to 'protect a defendant from the possibility of fabricated testimony out of which might be wrongfully established both the crime and its perpetrator.' . . . The corpus delicti rule arose from a judicial concern that false confessions would lead to unjust convictions. . . . Today's judicial retention of the rule reflects the continued fear that confessions may be the result of either improper police activity or the mental instability of the accused, and the recognition that juries are likely to accept confessions uncritically." ' " (*Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 830 [56 Cal.Rptr.2d 870], quoting *People v. Moreno* (1987) 188 Cal.App.3d 1179, 1187 [233 Cal.Rptr. 863].) In the preliminary hearing context, it has long been held that "[a] defendant cannot be held to answer unless the corpus delicti of the offense with which he is charged is established independently of his extrajudicial statements." (*People v. Martinez* (1972) 27 Cal.App.3d 131, 133 [103 Cal.Rptr. 451].)

In 1982, the voters approved the "Right to Truth-in-Evidence" amendment to the California Constitution,[4] which provides that "relevant evidence shall not be excluded in any criminal proceeding . . . ." (Cal. Const., art. I, § 28, former subd. (d).) Based on this amendment, appellant urges us to conclude that the corpus delicti requirement has been eliminated at the preliminary hearing stage of criminal proceedings. Appellant argues the trial court's dismissal of the conspiracy count was error because it was "based on a former corpus delicti rule, and resulted in the erroneous non-consideration of evidence relevant to the conspiracy charge."

Appellant complains that the trial court accepted the defense argument that the only possible evidence of agreement between the parties would be the statements of the codefendants and that "all arguments at the hearing echoed this theme." The district attorney countered this argument in the trial court, and argues here, by contending that as a result of the "Right to Truth-in-Evidence" amendment to the California Constitution, the codefendants' extrajudicial admissions must be considered to determine whether the corpus delicti rule is satisfied.

---

[4] We refer to the title of the 1982 ballot proposition (also referred to as Prop. 8) to avoid confusion with subsequent ballot propositions bearing the same number.

Accordingly, the centerpiece of appellant's argument is that the codefendants' extrajudicial statements should have been admitted into evidence at the preliminary hearing, and that those statements could have helped to provide sufficient "independent" evidence of the corpus delicti to support the conspiracy charge. We agree that the trial court erred at the preliminary hearing by refusing to admit certain extrajudicial statements by defendants which were relevant to the charges. However, we disagree that the admission of the statements would have made any difference. Although extrajudicial statements may be considered in determining whether the defendants may be held to answer; the consideration of such statements is proper *only after the corpus delicti rule is first satisfied.*

Appellant's mistake in arguing otherwise is based on the failure to appreciate the difference between the operation of the corpus delicti rule at the preliminary examination of the charges, and at trial, which was the situation in *People v. Alvarez* (2002) 27 Cal.4th 1161 [119 Cal.Rptr.2d 903, 46 P.3d 372] (*Alvarez*), upon which both parties rely. The dissent compounds this mistake by suggesting that *Alvarez* lessened the strictures of the corpus delicti rule at the preliminary hearing stage as follows: "the required 'independent evidence' does not have to stand alone, i.e., it may be considered in conjunction with the extrajudicial admissions." (Dis. opn., *post*, at pp. 420–421.) In fact, *Alvarez* affirmed the traditional requirement for independent evidence to establish the corpus delicti; and whether the extrajudicial admissions of the defendants could be used *at trial* for some other purpose is not at issue here.

In *Alvarez*, the Supreme Court addressed the impact on the corpus delicti rule of the "Right to Truth-in-Evidence" amendment to the California Constitution, which provides that "relevant evidence shall not be excluded in any criminal proceeding . . . ." (Cal. Const., art. I, § 28, former subd. (d).) Unlike the present case, *Alvarez* involved a trial. The Court of Appeal held that the trial court erred in failing to give a sua sponte instruction regarding "the need for independent proof of the corpus delicti" for committing a lewd act on a child, and reversed on that count. (*Alvarez, supra,* 27 Cal.4th at p. 1165.) The court found that failure to give the instruction "was prejudicial, because aside from defendant's preoffense statements introduced at trial, there was no [other] evidence of his lewd intent in touching the victim." (*Ibid.*) The Supreme Court held that the Court of Appeal had correctly ruled that section 28, former subdivision (d) of the California Constitution had not "abrogated the need for a corpus delicti instruction." (*Alvarez,* at p. 1166.) Nevertheless, the Supreme Court reversed and held that the instructional error was harmless "because the independent evidence of lewd intent was present." (*Ibid.*)

■ Justice Baxter's opinion in *Alvarez* thus concluded that the constitutional provision changed only one, not both, aspects of the corpus delicti rule: the first aspect regarding the admission of extrajudicial statements. The second aspect, regarding the rule's independent proof requirement to support a conviction, remained undisturbed. The opinion's legal conclusions are: first, that "section 28[, former subdivision] (d) [of article I of the California Constitution] *did* abrogate any corpus delicti basis for excluding the defendant's extrajudicial statements from evidence"; and second, that section 28, former subdivision (d) "*did not* abrogate the corpus delicti rule insofar as it provides that every *conviction* must be supported by some proof of the corpus delicti *aside from* or *in addition to* such statements, and that the jury must be so instructed." (*Alvarez, supra*, 27 Cal.4th at p. 1165.)

As a result of the first determination in *Alvarez*, "there no longer exists *a trial* objection to the *admission in evidence* of the defendant's out-of-court statements on grounds that independent proof of the corpus delicti is lacking. If otherwise admissible, the defendant's extrajudicial utterances may be introduced in his or her trial without regard to whether the prosecution has already provided, or promises to provide, independent prima facie proof that a criminal act was committed." (*Alvarez, supra*, 27 Cal.4th at p. 1180, first italics added.) However, as a result of the second determination, the jury must be instructed "that no person may be convicted absent evidence of the crime independent of his or her out-of-court statements"; also, the defendant may, on appeal, "attack the sufficiency of the prosecution's independent showing." (*Ibid.*)

■ The second determination of *Alvarez* is most relevant to this case, because it affirms application of the classical corpus delicti rule at the preliminary hearing stage of the criminal proceedings. If a defendant cannot be convicted in the absence of independent evidence establishing the corpus delicti, a magistrate cannot, in the absence of such independent evidence, hold him to answer. The magistrate cannot consider extrajudicial statements of the accused for the same reason underlying the mandated jury instruction in *Alvarez*: The prosecution must first prove the corpus delicti of the charged offense *without the use of extrajudicial statements*. Accordingly, "*Alvarez* changes nothing when it comes to application of the corpus delicti rule to preliminary hearings (except that there is no longer any basis to exclude a defendant's extrajudicial statements from evidence)." (*Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138, 148 [35 Cal.Rptr.3d 12] (*Rayyis*); accord, *People v. Herrera* (2006) 136 Cal.App.4th 1191 [39 Cal.Rptr.3d 578].)

Powers concedes that Judge Daum erred at the initial preliminary hearing by refusing to admit the extrajudicial statements of defendants. It is an easy

concession to make under these circumstances because the law is unambiguous: At the preliminary hearing, the magistrate could not consider the extrajudicial statements when making the threshold determination of whether the corpus delicti of conspiracy had been established, but should admit the statements after the corpus delicti rule was satisfied.[5] Here, the failure to admit the statements made no difference. Extrajudicial statements were admissible to answer the second—and distinct—set of questions posed at the preliminary hearing: whether there was sufficient evidence to support prosecution of each of the charges. If Judge Daum had determined that the corpus delicti was established, he surely would have formally admitted the extrajudicial statements and considered them in determining whether to hold respondents to answer on the conspiracy charge. Appellant and our dissenting colleague are simply mistaken in arguing that the extrajudicial admissions can add any weight to the preliminary hearing scale before, and unless, the corpus delicti rule is first satisfied.

■ Although admissible at a preliminary hearing, extrajudicial statements must be accompanied by independent evidence to support a charge or conviction. Specifically, the defendant may not be held to answer if no independent evidence of the corpus delicti is produced at the preliminary examination. (*Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 393 [157 Cal.Rptr. 809]; accord, *Alvarez, supra*, 27 Cal.4th at pp. 1169–1170, 1180 ["section 28[, former subdivision] (d) [of the California Constitution] did not eliminate the independent-proof rule insofar as that rule prohibits *conviction* where the only evidence that the crime was committed is the defendant's own statements outside of court"]; see also *People v. Jones* (1998) 17 Cal.4th 279, 300–301 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People v. Herrera, supra*, 136 Cal.App.4th at p. 1202.) The purpose of the preliminary hearing is to determine whether there is probable cause to require the defendant to answer to the charges against him or her. (§ 872, subd. (a); *People v. Brice* (1982) 130 Cal.App.3d 201, 209 [181 Cal.Rptr. 518], citing *Jennings v. Superior Court* (1967) 66 Cal.2d 867, 880 [59 Cal.Rptr. 440, 428 P.2d 304] [to order a defendant to answer to a charge, there must be sufficient cause to believe that the defendant is guilty].) At the preliminary hearing sufficient independent evidence is required to order the defendant to answer to a charge.

Appellant contends that, in reviewing a trial court's order to dismiss a charge, we determine "whether there is sufficient evidence in the preliminary examination transcript to permit the district attorney to file such allegation and take the matter to trial." (*People v. Superior Court (Jurado)* (1992) 4

---

[5] "The defendant may object to the *admission* of his extrajudicial statements on grounds that independent proof of the corpus delicti is lacking." (*Alvarez, supra*, 27 Cal.4th at p. 1165.)

Cal.App.4th 1217, 1225 [6 Cal.Rptr.2d 242], citing *People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278], superseded by statute on other grounds.) In support of the conspiracy count, the prosecution here relied on police testimony, including Detective Tomlin's opinions about the codefendants' involvement, defendants' "statements about the operational intricacies of [defendants'] drug distribution enterprise," and the "detectives' observations of [defendants] . . . engaging in counter-surveillance . . . [and possessing a] large amount of cocaine . . . , cutting tools[,] and ingredients indicating large scale narcotics sales . . . ." Although the facts adduced at the hearings certainly supported the prosecution of sales of cocaine by certain of the defendants, they are insufficient to infer that Powers and his associates conspired to sell cocaine together.

■ The conspiracy charge requires proof of four elements: (1) intent to agree and actual agreement to possess cocaine for sale, (2) intent for coconspirators to possess cocaine for sale; (3) overt acts to carry out the conspiracy, and (4) commission of at least one overt act in California. (See § 182, subd. (a); *People v. Bogan* (2007) 152 Cal.App.4th 1070 [62 Cal.Rptr.3d 34]; CALCRIM No. 415.) The first and third elements are principally at issue in this case, and we examine the record to separate the extrajudicial statements of defendants from independent evidence of facts from which a conspiratorial agreement might be inferred. "[I]ndependent proof may be circumstantial and . . . is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible." (*Alvarez, supra,* 27 Cal.4th at p. 1171.) The inference need only be reasonable. (*People v. Jones, supra,* 17 Cal.4th at pp. 301–302.) Although we agree with our dissenting colleague that the evidence supporting such an inference need only be " 'a slight or prima facie showing' " (*Alvarez,* at p. 1181), we observe that both appellant and the dissent rely on extrajudicial statements by defendants to reach even this low threshold of a prima facie showing.

The information filed—and refiled after the first hearing—by appellant alleged 10 "overt acts," which framed the facts adduced at the preliminary hearing:

"1. [Powers] drives out of the county on several occasions.

"2. Upon his return to the county, Powers immediately goes to 1109 Copeland Creek Drive, Rohnert Park.

"3. 1109 Copeland Creek Drive is owned/occupied by [Scheiner] and [Gearardo].

"4. Powers stores a safe at 1109 Copeland Creek Drive, in exchange he provided approximately 3.5 grams of cocaine per day to Scheiner and Gearardo.

"5. Powers possessed the key to the above described safe.

"6. Powers arrives almost daily to access or store cocaine in the safe at 1109 Copeland Creek Drive.

"7. [Floyd] arrived at 1109 Copeland Creek Drive, when Scheiner and Powers were present.

"8. Powers provides cocaine to Floyd.

"9. Powers gave Floyd two small boxes.

"10. Floyd loaded the boxes into his car and drove away."

The elements of the conspiracy charge include two required showings of intent: intent to agree and actual agreement to possess cocaine for sale, as well as intent for the coconspirators to possess cocaine for sale (§ 182, subd. (a)). Considered together, these elements refer to the intent to possess cocaine for sale *jointly* and must be distinguished from the similar but distinct intent to possess cocaine *individually*. Although allegation Nos. 1, 2, 3, 7, 9, and 10 were supported at the preliminary hearing by facts sufficient to show individual intent to possess cocaine (either for use or sale), the record is insufficient to establish conspiratorial intent. The record contains evidence to support an inference of an agreement between certain of the defendants to store a safe, but it does not contain evidence to connect all the defendants to the safe and its contents or to any sale of cocaine.

The facts supporting allegation Nos. 1, 2, 3, and 7, all involve the police surveillance of Powers, and establish that defendants knew one another and often associated. It is undisputed that police observed Powers and Floyd frequently visiting the Copeland address where Scheiner and Gearardo lived, and that Powers often went there in the course of his out-of-county trips.

While it is also undisputed that Powers drove the green BMW car "on occasions," the detectives could neither verify that Powers was the driver of the vehicle on all the trips they tracked; nor learn the addresses of the destinations visited out of the county. The evidence of a pattern of deception on the part of Powers included the driving pattern of the green BMW on these trips. According to Detective Tomlin's expert opinion, the driving pattern is known as "counter-surveillance" and indicated "deception." However, Tomlin also agreed that the driving pattern was common to drivers looking for parking. He could not verify the identity of the driver of the green BMW because he watched the car's perambulations on a computer linked to the GPS tracking device attached to the car.

Nothing in Tomlin's testimony regarding driving patterns or the visits between defendants shows a conspiratorial agreement between the parties. The search of Floyd's home produced cocaine sufficient for sale but no indicia of any connection to the safe, its contents, or the distinctive drug paraphernalia found at the Copeland house. Other than Floyd's acquaintance with the other defendants and his own admissions, the only evidence the prosecution relied upon was Tomlin's observation of the transfer of the two small boxes observed by Powers to Floyd. However, there is no evidence regarding the boxes' contents, which remain a matter of pure speculation. Tomlin was expressly unable to offer any opinion regarding the contents of the boxes .because there was no evidence upon which to base such a conclusion. Any opinion he might have offered regarding Floyd's involvement in cocaine sales was necessarily limited to the facts: his mere observation of the boxes being transferred, with no knowledge or conjecture as to their contents.

■ Expert opinion testimony may support the corpus delicti when two conditions are met. First, the opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Second, the opinion must be based on "matter . . . perceived by or personally known to the witness . . . that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert's] testimony relates . . . ." (Evid. Code, § 801, subd. (b).) Although the expert cannot directly opine that the defendant is "guilty" to support the corpus delicti (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1227 [285 Cal.Rptr. 158]), the expert may testify as to various " 'ultimate issues' " including facts necessary to establish the corpus delicti of a charge. (*Ibid.*) For example, a medical examiner might testify that

the condition of a cadaver indicated homicide as the cause of death, thus supporting a charge of murder.

We agree with our dissenting colleague that *Rayyis* stands for the proposition that the opinion testimony of an expert can provide independent evidence to support a charge. (*Rayyis, supra,* 133 Cal.App.4th at p. 143.) However, the opinion in *Rayyis* also demonstrates the limits of expert testimony in this preliminary context: Expert opinion testimony cannot support a finding of the corpus delicti unless the opinion is supported by independent evidence. In *Rayyis,* the trial court ordered the defendant to answer a charge of filing false income tax returns and a charge of money laundering. (*Ibid.*) To support the charge of filing a false income tax return, a senior special agent from the Franchise Tax Board gave his opinion that the defendant underreported his income. (*Ibid.*) The agent based his analysis on his comparison of the defendant's bank record and tax returns; the bank record reflected the receipt of more income than the income reported in the defendant's tax returns. (*Ibid.*) The appellate opinion held that the agent's opinion testimony—based on his analysis of the bank records and corresponding tax returns— reasonably supported the charge of filing false income tax returns, but did not satisfy the statutory requirement for a showing of "criminal activity" because there was no evidence of a contemporaneous crime. (*Id.* at p. 152.)

*Rayyis* informs us that expert opinion testimony can establish the existence of facts indicating a crime had been committed (e.g., the mathematical calculation showing underreported income, or the cause of death in a murder case) but cannot support the inference of a committed crime in the absence of independent facts. In *Rayyis* the money laundering charge could not be supported because the "laundered" money transfer to the defendant's children occurred before the crime of underreporting of income which was the only evidence the prosecution relied upon to show the required "criminal activity."[6] (*Rayyis, supra,* 133 Cal.App.4th at pp. 151–152.) Expert opinion testimony can only support a charge when the opinion draws its conclusions from competent facts.

Tomlin's conclusions were inadequate to satisfy the corpus delicti rule. Not only was his opinion based in part on defendants' statements, there was also a lack of competent evidence to make the necessary connections supporting a reasonable inference of conspiratorial agreement. Based on his "investigation as a whole" Tomlin concluded that Powers was transporting and selling cocaine in Sonoma County and "using Floyd to assist him in distributing the narcotics." However, there was no independent evidence connecting Floyd to

---

[6] The crime of money laundering requires either the specific intent to carry on a criminal activity or knowledge that a monetary instrument derives from a criminal activity. (§ 186.10, subd. (a).)

cocaine sales by Powers. The "large" scale and cutting agent were found at the Copeland house, not at Floyd's home; and the search of Floyd's house did not yield "any similar packaging or anything consistent with the physical evidence recovered from the Gearardo/Scheiner residence." Floyd's counsel conceded the 72 grams of cocaine found at Floyd's home could properly support a charge of individual possession for sale, but justifiably argued to the trial court that there was no competent, independent evidence of any connection between Floyd and the safe in the Copeland residence.

The second portion of Tomlin's opinion (in support of allegation No. 4) was that: "[Scheiner and Gearardo] were users of cocaine, who based on their habit, allowed another person to store illegal substances in their residence to support themselves." "He was paying them with cocaine to support their habit." The intent to possess cocaine for sale can be inferred if the amount possessed was a larger quantity than would be expected for personal use. (*People v. Fitzwater* (1968) 260 Cal.App.2d 478, 490 [67 Cal.Rptr. 190].) However, although Detective Tomlin testified that 3.5 grams of cocaine might be used daily by two highly addicted people, *he expressly refused to offer any opinion that the amount was large enough to infer it was held for sale.* Moreover, the factual basis for Tomlin's opinion is only completed by Gearardo's statement that Powers stored the safe at her home in exchange for leaving her and Scheiner 3.5 grams of cocaine for their own use. The only evidence connecting the contents of the safe—and the drug paraphernalia found at the Copeland house—comes from Gearardo's statements. Also, the full extent of Tomlin's opinion regarding Scheiner and Gearardo—even including Gearardo's extrajudicial admissions—was carefully framed to say that they "were users of cocaine, who based on their habit, allowed another person to store illegal substances in their residence to support themselves."

Accordingly, the information's allegations Nos. 4 and 8 (that Powers supplied cocaine to the other defendants) are not supported by independent evidence sufficient to infer a conspiratorial agreement. On cross-examination, it was obvious that Tomlin's opinion regarding the cocaine supplied by Powers to Floyd, Scheiner, and Gearardo was based on defendants' own statements. Exclusion of defendants' extrajudicial statements from the evidence shortens the established part of allegation No. 4 to read: "Powers stores a safe at 1109 Copeland Creek Drive." Allegation No. 8 ("Powers provides cocaine to Floyd.") is based entirely on defendants' statements and properly excluded from consideration.

Allegation No. 5 adds only that Powers possessed "the key" to the safe, but this adds nothing to show an actual "agreement" to possess cocaine for sale. Evidence was presented that a combination was also required to open the safe; and no combination was found. Certainly the inference can reasonably

be drawn that Powers knew the other defendants, that he was deceptive in his behavior; that he had an arrangement to rent space for the safe, which he often visited; and that the safe was found to contain cocaine for sale. However, any inferences to be drawn from these facts are limited to Powers. By the express terms of Tomlin's carefully worded opinion the "rental" arrangement he described is not evidence supporting any inference of a conspiracy; and Gearardo's statements are required to show that she and Scheiner even knew, let alone intended, anything more than allowing Powers access to the garage in order to "feed their own habits." The prosecution presented evidence to support allegation No. 8 that Floyd possessed and sold the cocaine found at his house, but the prosecutors necessarily relied on his extrajudicial statements to show that the cocaine was supplied by Powers. Finally, even assuming that any of defendants' statements could be used to show that Powers supplied Floyd, Scheiner, and Gearardo with cocaine, the prosecution failed to show either that the amount was sufficient to show for possession for sale, or in Floyd's case, that the larger amount he possessed was not possessed only for his individual sale.

The prosecution asserts that intent to conspire to possess and sell cocaine is "demonstrated by the mutual benefit derived by all," and attempts to support this assertion by citing *People v. Cockrell* (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116], for the proposition that "[i]t need not be shown that the parties met and actually agreed to jointly undertake criminal action," for the agreement to be inferred from the defendants' conduct in mutually carrying out a common purpose in violation of a penal statute. (*Id.* at p. 667.) *Cockrell* is easily distinguished from this case because the Supreme Court's opinion observed that *each of the alleged conspirators participated in the sales* in question. Evidence that the defendants jointly participated in a sale can be sufficient to infer an agreement between the conspirators as well as showing an overt act in furtherance of that agreement. However, defendants in the case before us did not engage in any observed joint sales or transfers of cocaine. The individual "benefit" derived by each of the defendants is not apparent without considering their extrajudicial statements; and those statements themselves suggest there was not a "common" purpose in the sense urged by appellant.

All of the cases cited by the dissent for the unremarkable proposition that "circumstantial evidence and/or inferences are clearly permissible types of such 'independent evidence' . . ." are easily distinguished from the case before us. (Dis. opn., *post*, at p. 421.)

*People v. Lipinski* (1976) 65 Cal.App.3d 566 [135 Cal.Rptr. 451] (*Lipinski*), principally relied upon by the dissent, is a fair example: in that case an undercover police officer negotiated a meeting for the purchase of drugs

between himself, his initial contact, and a third party. The meeting took place in an airport, where the officer actually observed the two defendants discussing the arrangements for the drugs to be left in a car to be picked up after the payment was made. Another officer followed the defendants to the car and observed the transfer of a distinctively marked bag, which the first defendant took back to the first undercover officer. The other cases cited by the dissent for the idea that circumstantial evidence can support a conspiracy charge are similarly distinguishable:

*People v. Osslo* (1958) 50 Cal.2d 75, 94–96 [323 P.2d 397] involved an assault committed by thugs involved in a labor dispute. There were numerous meetings among the defendants in the days leading up to the day of the assault; but there was also evidence that seven defendants made a joint visit to the precise location of the assault on the day of the alleged crime; five of the defendants were observed in an automobile leased by their codefendants' union on that day; and one of the defendants had agreed to pay a weekly salary and expenses to certain of the codefendants under circumstances where some of the codefendants had arrived in the city just one week prior to the incident.

*People v. Longines* (1995) 34 Cal.App.4th 621, 626 [40 Cal.Rptr.2d 356] involved an undercover agent arranging a drug transaction. During the transaction, the undercover agent observed the minor conversing with the appellant in a park; was directed by the minor to go to a parking lot, where the minor introduced him to the appellant; and handed the appellant money, receiving in return a Ziploc bag containing marijuana. The court held that this "sequence of events" provided compelling evidence that the minor and appellant "were working together, each performing a different and essential function in bringing the sales transaction to a successful conclusion." (*Ibid.*)

In *People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734 [32 Cal.Rptr.2d 288], four defendants were convicted of conspiracy to possess cocaine for sale after police officers observed two of them leaving a condominium in a car, going to a grocery store parking lot to make phone calls using the public phone, greeting another defendant who soon appeared, and leaving to go to a second parking lot. At the second lot, another defendant appeared and drove the vehicle to a home owned by another codefendant who opened the garage door to allow the vehicle to enter. The police immediately detained the defendants and found 200 kilograms of cocaine in the garage and traces of cocaine in a hidden compartment in the vehicle driven from the parking lot to the garage. In the condominium where the surveillance started, the police found another 90 kilograms of cocaine and drug packaging materials. Various other items were found (including pagers, identification with different names, and a fictitious name registration for one of the vehicles) connecting all the defendants to the cocaine.

In *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1232 [277 Cal.Rptr. 382], the charges alleged aggravated kidnapping for ransom, extortion, or reward. Under the instruction of his employer, a defendant arrived at the victim's house with accomplices, whom he directed to put the victim in the trunk of a car. He delivered a note to the victim's wife demanding that she deliver the money to him in the family's bank accounts and deposit box. The appellate court concluded that such acts established that the defendant was a "willing and continuing participant in a crime designed to carry off and hold [the victim] until the property sought from him had been obtained." (*Ibid.*) There was no direct evidence of the agreement between the defendant and his employer, but the court cited *Lipinski* in support of the conclusion that the defendants' conduct in carrying out the conspiratorial purpose supported the inference of a conspiratorial agreement.

In *People v. Pitts* (1990) 223 Cal.App.3d 606 [273 Cal.Rptr. 757], superseded by statute on other grounds, seven defendants were convicted of conspiracy to commit lewd or lascivious acts on children and employment of a minor to produce obscene material or child pornography. The opinion spans hundreds of pages, describing numerous acts of child molestation by the defendants and involving several children. At least one of the children identified all the defendants as being present during several of these incidents; and the evidence showed that the defendants met several times for the purpose of molesting children and recording their crimes. The court cited *Lipinski* and held that the conspiratorial agreement could be inferred from "the number of times this went on and the nature of the acts that occurred." (*Pitts*, at pp. 891–892.)

*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1402–1403 [251 Cal.Rptr. 880] and *People v. Towery* (1985) 174 Cal.App.3d 1114, 1132 [220 Cal.Rptr. 475], both involved the conspirator exception to the hearsay rule following objections asserted at trial. In *Olivencia*, at page 1402, two defendants were convicted of false imprisonment. At trial, one defendant made a hearsay objection to a witness's testimony regarding the second defendant's statement that they "had" the victim and her child. Although the trial court overruled the objection on grounds that the statement was admissible as the statement of a coconspirator, the defense argued there was no evidence of an agreement to achieve an unlawful objective. The court, however, disagreed, citing *Lipinski* for the same proposition described in *People v. Pitts*. Even without resort to the contested hearsay testimony, the victim had testified that the defendants had entered her apartment together and that one defendant told the other to remain with the victim at the apartment. (*Olivencia*, at p. 1403.) The court held this was sufficient evidence to show that the defendants were engaged together in a conspiracy to falsely imprison the victim and her child. In *People v. Towery, supra*, 174 Cal.App.3d 1114, the argument was slightly different, i.e., the defense argued that recordings of conversations between a

police officer and the defendants, discussing the planned theft, were not statements by the conspirators (*id.* at pp. 1130–1131), but the point is the same: the operation of the corpus delicti rule is different at trial, where more evidence, including the extrajudicial statements of the defendants, may be considered.

In *People v. Martin* (1983) 150 Cal.App.3d 148, 163 [197 Cal.Rptr. 655], the defense argued there was insufficient evidence to establish conspiracy to commit extortion and conspiracy to commit assault with a deadly weapon. After getting into a dispute with the deceased victim, the defendant had directed the boyfriend of his employee to beat up the victim and to collect money. The boyfriend ended up killing the victim and testified at trial that the defendant solicited him to assault the victim and threatened the loss of a job as leverage. Citing *Lipinski*, the court held there was sufficient evidence to support both counts of conspiracy.

In summary: all of the foregoing cases relied upon by the dissent involved trials where the operation of the corpus delicti rule is different from its application at a preliminary hearing, and in each of these cases, the circumstantial evidence of the mere acquaintance between the defendants was supplemented by the defendants' direct connection to at least one overt act, which was indisputably criminal conduct.

■ Section 182, subdivision (a), requires evidence of such an overt act to carry out the conspiracy. Since no sales were observed in this case, allegations Nos. 7 and 9 attempt to satisfy this element by asserting that all the defendants were present—apparently working on one of the BMW's that were a shared interest—at the Copeland address when Detective Tomlin observed Powers handing Floyd two small boxes. There is no evidence whatsoever of the contents of the boxes. The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators. However, as discussed above, mere suspicion of criminal conduct is not enough. (*People v. Lowery* (1988) 200 Cal.App.3d 1207, 1218 [246 Cal.Rptr. 443].) There must be some evidence to demonstrate that the association is also a conspiracy (*People v. Hardeman* (1966) 244 Cal.App.2d 1, 41 [53 Cal.Rptr. 168]). The permissible evidence in this case shows an association between defendants, but no agreement to do more than store a safe; and, unlike the cases cited by the dissent, this record contains no evidence of any overt act, such as an observed transfer or sale of drugs, in furtherance of a common purpose. The two small boxes were empty for the purposes of our discussion.

Tomlin's opinion cannot supply the missing evidence to establish the corpus delicti of conspiracy. First, it related only to the "ringleader" Powers

"the pattern of behavior of this particular defendant, [Powers] goes to the totality of the operation of a large scale drug trafficking." Second, the opinion patently relies on extrajudicial statements excluded by the corpus delicti rule. "If I had to form an opinion, which I did on this case, it's that [Powers] was the ringleader of this operation, that Floyd *at his own admission* in an interview with me, was selling cocaine at a smaller level on the street, and that the Gearardos [*sic*] were users of cocaine *who based on their habit*, allowed another person to store illegal substances in their residence to support themselves." (Italics added.) An expert cannot directly opine that the defendant is guilty to support the corpus delicti. (*People v. Harvey, supra*, 233 Cal.App.3d at p. 1227.)

We agree with the dissent that the existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the conspiracy (*People v. Lowery, supra*, 200 Cal.App.3d at p. 1218). However, as previously explained, mere suspicion is not enough. " 'There must be some evidence. Mere association does not make a conspiracy.' " (*People v. Hardeman, supra*, 244 Cal.App.2d at p. 41.) Thus, simply knowing that a person's products or services are being used for a criminal purpose is insufficient. (*People v. Lauria* (1967) 251 Cal.App.2d 471, 482 [59 Cal.Rptr. 628].) The lengthy transcript of the preliminary hearing before Judge Daum, which was also reviewed by Judge Gnoss with the same result, persuades us that the elements of the charged conspiracy were not proved by the prosecution on the basis of evidence independent of defendants' extrajudicial statements.

Indeed, the sufficiency of the evidence may not be the genuine issue before us. Appellant does not back up his legal argument with an alternative factual claim, as did the prosecutor in the appeal in *Alvarez*. Also, appellant does not claim that there is sufficient independent evidence to establish the corpus delicti of conspiracy. As in the trial court, appellant's argument in this court is limited to the untenable contention that defendants' extrajudicial statements should have been considered in determining whether the corpus delicti was proved. As we discussed at the outset of this opinion, that contention is incorrect; and because appellant has not made any alternative factual argument he has effectively waived the issue of the sufficiency of the evidence. In any event, the foregoing analysis demonstrates that the alternative argument would have been without merit based on this record.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., concurred.

**HAERLE, J.,** Dissenting.—I respectfully dissent, and do so for four principal reasons: (1) I do not believe the majority's opinion accurately sets forth the *quantity* of "independent evidence" adduced at a preliminary hearing which is sufficient to satisfy the corpus delicti rule; (2) nor, I submit, does the majority adequately deal with the principle that circumstantial evidence and inferences are both permissible types of "independent evidence" of a charge of conspiracy; (3) nor does the majority adequately deal with the very liberal standard of proof applicable at preliminary hearings; and (4) I believe that, considered under the combination of those three standards, there was ample "independent evidence" of a conspiracy adduced by the prosecution at the preliminary hearing. For those reasons, I would reverse the trial court and remand the case to it with instructions to reinstate the dismissed conspiracy charge against defendant and respondent, Frank Evan Powers-Monachello.

## I.

Regarding the first point, the quantity of independent evidence necessary for the prosecution to present at a preliminary hearing, the majority cites and quotes from our Supreme Court's recent opinion in *People v. Alvarez* (2002) 27 Cal.4th 1161 [119 Cal.Rptr.2d 903, 46 P.3d 372] (*Alvarez*). But, regrettably, it omits several highly pertinent statements from that opinion, statements I believe are clearly applicable here regarding precisely that issue.

In the course of reversing the holding of a panel of the Fourth District (which had held the corpus delicti principle not satisfied), the *Alvarez* court made clear the minimal quantity of independent evidence (i.e., here, evidence above and beyond statements by others) required to satisfy the corpus delicti rule. It stated: "Of course, as we have seen, the modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1181.)

The court cited, among its several prior holdings on the subject, *People v. Jones* (1998) 17 Cal.4th 279 [70 Cal.Rptr.2d 793, 949 P.2d 890]. There, it had emphasized that: "[W]e have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a *slight or prima facie showing* of some injury, loss or harm, and that a criminal agency was involved." (*Id.* at p. 303, italics added.)

Quite importantly, the *Alvarez* court also stressed that the required "independent evidence" does not have to stand alone, i.e., it may be considered in

conjunction with the extrajudicial admissions. (*Alvarez, supra,* 27 Cal.4th at p. 1171.) This is made clear by its phrase that such evidence may be considered "*in addition to* such statements" (*id.* at p. 1165) and by its later emphasis that: "In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Id.* at p. 1171; see also, to the same effect, *Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138, 144–145 [35 Cal.Rptr.3d 12] (*Rayyis*), a decision relied on extensively by the majority; see maj. opn., *ante,* at pp. 408 & 413.)

As applied here, this means that the trial court could well have considered *both* the admissions of the former codefendants *and* the other evidence presented, *if* the latter met the "slight or prima facie showing" standard articulated in *Alvarez.* As I will outline in part IV. below, I believe that standard was easily met here.

## II.

Many cases—most of them not discussed or cited by the majority—make clear that circumstantial evidence and/or inferences are clearly permissible types of such "independent evidence," especially regarding a charge (as here) of criminal conspiracy.

One of the earliest of these cases is *People v. Osslo* (1958) 50 Cal.2d 75, 94–96 [323 P.2d 397]. There, the court affirmed the conviction of multiple defendants whom a San Diego Superior Court jury had convicted of conspiracy to commit assault. On appeal, those defendants challenged the sufficiency of the evidence to establish conspiracy, but were rebuffed in that argument by this response from our Supreme Court: "It is true that there is no *direct* evidence of a conspiracy; all the direct evidence bearing on the question is to the effect that the defendants who actually participated in the assault and battery had been instructed to avoid the use of violence. But 'A conspiracy can generally be established only by circumstantial evidence. It is not often that the direct fact of a common unlawful design can be proved other than by the establishment of independent facts bearing on such design.' [Citations.]" (*Id.* at p. 94.)

This court made this principle even clearer in our decision in *People v. Lipinski* (1976) 65 Cal.App.3d 566, 575–576 [135 Cal.Rptr. 451] (*Lipinski*), where we stated: "It is likewise well recognized that the very crux of the conspiracy, the evil or corrupt agreement [citations], may be shown also by circumstantial evidence. Thus, it is not necessary to prove that the parties met and actually agreed to perform the unlawful act or that they had previously arranged a detailed plan for its execution. Rather significantly, *the agreement*

*may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute* [citations]. As the court put it in *People* v. *Morales* [(1968) 263 Cal.App.2d 368,] 376 [69 Cal.Rptr. 402], the sufficiency of evidence relative to the establishment of a conspiracy must be viewed against the background of the type involved, and ' *"If there be knowledge by the individual defendant that he is a participant in a general plan designed to place narcotics in the hands of ultimate users,* the courts have held that *such persons may* be deemed to *be regarded as accredited members of the conspiracy."* ' [Citation.]" (*Lipinski, supra,* at pp. 575–576; see also, citing *Lipinski* and to the same effect: *People v. Longines* (1995) 34 Cal.App.4th 621, 626 [40 Cal.Rptr.2d 356]; *People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734 [32 Cal.Rptr.2d 288]; *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1232 [277 Cal.Rptr. 382]; *People v. Pitts* (1990) 223 Cal.App.3d 606, 891 [273 Cal.Rptr. 757]; *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1402–1403 [251 Cal.Rptr. 880]; *People v. Towery* (1985) 174 Cal.App.3d 1114, 1132 [220 Cal.Rptr. 475]; *People v. Martin* (1983) 150 Cal.App.3d 148, 163 [197 Cal.Rptr. 655].)

I respectfully submit that the evidence summarized in part IV. of this opinion clearly meets this standard. But before detailing that evidence, it is also appropriate to discuss the related issues of the standard of proof required at a preliminary hearing and at a Penal Code section 995 (section 995) hearing.

### III.

The governing statute on the standard of proof required at preliminary hearings is Penal Code section 872, subdivision (a), which provides that the magistrate shall order a defendant to answer to a criminal complaint as and when "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe that the defendant is guilty . . . ." (Pen. Code, § 872, subd. (a).)

The cases applying and interpreting this statute have made clear that this, too, is a rather liberal standard. Thus, in *People v. Orduno* (1978) 80 Cal.App.3d 738 [145 Cal.Rptr. 806], certiorari denied *Orduno v. California* (1979) 439 U.S. 1074 [59 L.Ed.2d 41, 99 S.Ct. 849], the court wrote: "At a preliminary hearing, the magistrate must decide only whether there is 'sufficient cause' to believe the defendant guilty of a probable offense. That phrase is generally equivalent to 'reasonable and probable cause' which has been defined as such a state of facts as would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.]" (*People v. Orduno, supra,* at p. 750; see also *People v. Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511

P.2d 609]; *People v. Batista* (1988) 201 Cal.App.3d 1288, 1292 [248 Cal.Rptr. 46]; *People v. Ortiviz* (1977) 74 Cal.App.3d 537, 541 [141 Cal.Rptr. 483]; 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 147, pp. 349–350, and cases cited therein.)

Post-*Alvarez*, this principle is even stronger. Because of the ruling in that case regarding the admissibility of the statements of a defendant or coconspirator, at a preliminary hearing "the amount of additional evidence that is required to satisfy the corpus delicti rule (aside from the defendant's extrajudicial statements) is 'slight' or 'minimal.' " (*Rayyis, supra*, 133 Cal.App.4th at p. 149.)

My colleagues seem to feel that the corpus delicti rule is applied differently in a preliminary hearing. They argue that the cases I rely upon hereafter regarding the application of that rule are distinguishable because they "involved trials, where the operation of the corpus delicti rule is different from its application at a preliminary hearing . . . ." (Maj. opn., *ante*, at p. 418.) But this statement runs directly contrary to *Rayyis, supra*, 133 Cal.App.4th 138, a case my colleagues repeatedly cite approvingly. (See maj. opn., *ante*, at pp. 408 & 413.) In that case, the court held: "*Alvarez* changes nothing when it comes to application of the corpus delicti rule to preliminary hearings (except that there is no longer any basis to exclude a defendant's extrajudicial statements from evidence). Moreover, there is nothing in the language of section 28[, subdivision] (d) [of article I of the California Constitution]—the constitutional provision at issue in *Alvarez*—that could be construed as affecting only preliminary hearings. To the extent section 28[, subdivision] (d) affected application of the corpus delicti rule at trial, it affected its application at preliminary hearings, no more and no less." (*Rayyis, supra*, at p. 148.)

A similar principle applies when, as here, the hearing is conducted under section 995 after the filing of an information.[1] In *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 [6 Cal.Rptr.2d 242], the court defined the relevant rule thusly: "In determining if charges in an information can withstand a motion under section 995, neither the superior court nor the appellate court may reweigh the evidence or determine the credibility of the witnesses. [Citations.] Ordinarily, if there is some evidence in support of the information, the reviewing court will not inquire into its sufficiency. [Citations.] Thus, an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.] [¶] 'Although there must be *some* showing as to

---

[1] The ruling at issue here involves a combination of a preliminary hearing record and a section 995 hearing. Although the motion brought by respondent was under section 995 subsequent to the prosecution's filing of the information against him, in granting that motion the trial court clearly relied almost entirely on the transcript of the earlier preliminary hearing.

the existence of each element of the charged crime [citation] such a showing may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate.' [Citation.] 'Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' [Citations.] Thus, the ultimate test is that ' " "[a]n information will not be set aside or prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " ' [Citation.]" (Italics omitted; see also *People v. Jimenez* (1995) 38 Cal.App.4th 795, 801–803 [45 Cal.Rptr.2d 466].)

When this standard is combined with the two other principles noted above, i.e., that (1) only "some slight or prima facie showing" is necessary *in combination with* the now admissible extrajudicial statements of a codefendant (see *Alvarez, supra*, 27 Cal.4th at pp. 1171 & 1181) and (2) "circumstantial evidence" and/or an "inferred" agreement are sufficient to establish a conspiracy (see *Lipinski, supra*, 65 Cal.App.3d at pp. 575–576), I believe there was more than adequate evidence adduced at the preliminary hearing to require respondent to be held to answer the conspiracy charge in the information.

I will now outline what that evidence was.

## IV.

I believe neither the arguments made to us by defendant and respondent nor their acceptance by the majority fully state the relevant evidence adduced by the prosecution at the preliminary hearing. For example, respondent's brief to us argues: "Herein, other than the statements by Gearardo-Scheiner and Floyd, the only evidence in the record that appellant can claim possibly demonstrates a conspiratorial agreement is: (1) respondent, or someone else driving the green BMW, performed counter-surveillance activities as he or she drove from community to community; (2) respondent regularly frequented the residence at 1109 Copeland Creek Drive, Rohnert Park; (3) respondent was found in possession of a key, common to many safes, that fit the safe found at 1109 Copeland Creek Drive, Rohnert Park, although he was not found in possession of the electronic combination to the safe; (4) respondent was seen in the presence of Scheiner and Floyd; and (5) respondent was observed giving two shoe-box size packages to Floyd on one occasion."

The following facts and evidence are either omitted or misstated in that argument of defendant and respondent—and many of them are also not mentioned or considered by the majority:

1. No one other than respondent was ever seen driving the green BMW; it was, during the periods of the surveillances, respondent's regular vehicle for his many trips out of and then back into Sonoma County;

2. In driving that car, appellant's several detectives performed extensive and thorough countersurveillance activities. The descriptions provided of those activities, whether seen visually in downtown San Francisco or in Rohnert Park, or seen via the GPS device at other locations (Oakland, San Rafael, San Mateo, Hayward, etc.) established that they were remarkably expert. And also successful, as witness his May 2007 trip to San Francisco.

3. Respondent had reported to his parole officer that his residence was the Branching Way house in Petaluma. However, unmentioned by the majority is the fact that he *never went to that address* during the period he was under surveillance. But he did, in fact, have a real residence: the Grandview Way house he occupied with his girlfriend, and to which he returned after each trip out of the county—albeit apparently always after having stopped first at the Copeland Creek house. Perhaps most importantly, as far as this record reveals (but again never mentioned by the majority), respondent never reported to his parole officer that he actually lived in Rohnert Park, *not* Petaluma.

4. Respondent had no visible occupation, much less one that could or would feasibly entitle a 24 year old to be the possessor and apparent owner of five different vehicles, not to mention over $15,000 in cash. And his girlfriend (never a codefendant) told the investigating officers that respondent had told her he was in the construction business, although she admittedly wondered about that because of his always "smooth" hands and the fact that he did not appear to own either work tools or clothing.

5. Respondent did far more than regularly frequent the residence at 1109 Copeland Creek. He regularly entered that residence *without knocking or ringing any bell, either via the front door or the garage.* He was clearly personally friendly with the male resident of that house, Scheiner. More specifically, he was seen working with Scheiner on the green BMW, which had its hood up, regarding some sort of "wiring for stereo speakers or some kind of speakers."

6. There is no evidence in the record that the safe key found in what was, almost certainly, respondent's jeans on the floor of the master bedroom at Grandview Way, was common to many safes. Common sense suggests that any manufacturer of such safes does not provide a "one key fits all" system. And the fact that normal entry to such a safe requires both a key and a combination and no written record of the combination was found at either house does not detract from the discovery of a key which fit into the lock on this specific safe.

Regarding the safe at the Copeland Creek address, the majority concedes that the record "contains evidence to support an inference of an agreement between certain of the defendants to store a safe, but it does not contain evidence to connect all the defendants to the safe and its contents or to any sale of cocaine." (Maj. opn., *ante*, at p. 411.) This contention frankly puzzles me: (a) the safe—and cocaine usage paraphernalia—were found at the Copeland Creek residence of two of the defendants, (b) what was (at the minimum "inferentially") a key to it was found in respondent's clothes at his de facto residence, and (c) the safe contained cocaine. Why cannot an inference of a conspiracy involving respondent and those other defendants be drawn from those facts?

7. Finally, there was the extensive opinion evidence adduced by Detective Tomlin which, to its credit, the majority references.[2] Tomlin was asked for his "opinion as to what was taking place based on your observations." He responded that, in his opinion, "this was a large scale, larger than what's been seen in some time, cocaine distribution . . . in Sonoma County." He explained that, from his experience, he was aware that the "Bay Area is one of the central points where narcotics coming out of other countries will come in and then be distributed out to other areas" and that respondent was making his frequent "trips to the Bay Area and pick up quantities of cocaine." He was then "bringing his narcotics back into Sonoma County" and selling them there and "using Mr. Floyd to assist him in distributing the narcotics at the street."

Tomlin went on to opine that Scheiner and Geararrdo (a married couple) "were assisting" respondent "by allowing him to keep the cocaine at their residence so that he could avoid detection. In exchange for them allowing him to do this, he was paying them with cocaine to support their habit" and "storing narcotics there to avoid detection." Respondent was, in Tomlin's opinion, "the ringleader of this operation" and used Floyd to sell "cocaine at a smaller level on the street."

Finally, Tomlin opined that the reason respondent listed his residence with his parole officer as the Branching Way house in Petaluma (a house owned by his father) was that the residence of a person on parole is subject to search at

___

[2] And correctly so, as opinion evidence *is* admissible as either some or all of the "slight" or "minimal" independent evidence required. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 450–451 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Malfavon* (2002) 102 Cal.App.4th 727, 734–735 [125 Cal.Rptr.2d 618]; *Rayyis, supra*, 133 Cal.App.4th at p. 151.) Further, all defense counsel at the preliminary hearing, including defendant and respondent's counsel, stipulated to Detective Tomlin's expertise for purposes of that hearing.

any time and that, in fact, respondent "was using Grandview Way in Rohnert Park as kind of his home base where he was living with his pregnant girlfriend."

## V.

All of the above convinces me that there was indeed "some slight or prima facie" level of evidence adduced "*in addition to*" the admissions of former codefendants Floyd and Scheiner (*Alvarez, supra*, 27 Cal.4th at pp. 1171, 1165, 1177) to satisfy the corpus delicti rule.[3] It seems clear, therefore, that this was not a prosecution directed at "a crime that never happened." (*Id.* at p. 1169.)

Reinforcing this conclusion are the arguments made by this respondent's counsel at the section 995 hearing. There, he contended that the magistrate who conducted that preliminary hearing had been "correct" that there had been "no independent evidence of an agreement," and then added that there were "[n]o inferences that could be drawn from the evidence that was presented of the agreement."[4] The trial court appeared to agree with this argument, as it stated a few pages later: "I need to focus on the evidence before we get to the statements. What I'm deciding is whether those statements should come in. So I'm really not considering those statements at all until I make a ruling on whether or not those statements should come in in regards to conspiracy."

As noted above, in his brief to us, defendant and respondent concedes that the trial court erred in excluding those statements. However, he continues, any such error was and is harmless because, even considering those statements, there was insufficient independent evidence of a conspiracy. The majority essentially agrees with this argument.

I believe that such a conclusion is simply not consistent with the principles articulated by our Supreme Court in *Alvarez*. As noted previously, that court specifically stated that (1) "independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible," (2) "once the necessary quantum of independent evidence is present, the . . .

---

[3] Indeed, in his brief to this court, respondent concedes that there was adequate evidence in the record to support six of the 10 overt acts charged in the information.

[4] As the People point out in their briefs to us, this is consistent with the argument made by respondent's counsel at the preliminary hearing. There, that counsel relied on several pre-*Alvarez* cases in contending that there was insufficient independent evidence of a conspiracy to permit the court to consider the two extrajudicial statements. Those same cases are cited in defendant and respondent's brief to us.

extrajudicial statements may then be considered for their full value to strengthen the case on all issues," and (3) the requisite independent evidence may be considered "*in addition to* such statements." (*Alvarez, supra*, 27 Cal.4th at pp. 1171 & 1165.) I believe there clearly was sufficient evidence presented at the preliminary hearing to permit "an inference of criminal conduct." (*Id.* at p. 1171.)

I believe the majority substantially ignores the appropriateness of considering both "inferences" and circumstantial evidence because, among other things, my colleagues never cite, much less discuss, this court's discussion of that precise issue in *Lipinski, supra*, 65 Cal.App.3d at pages 575–576. Rather, the majority asserts: "Although the facts adduced at the hearings certainly supported the prosecution of sales of cocaine by certain of the [individual] defendants, they are insufficient to infer that Powers and his associates conspired to sell cocaine together." (Maj. opn., *ante*, at p. 410.)

I strongly disagree. The "slight" or "minimal" independent evidence sufficient to permit an inference of such a conspiracy is summarized in part IV. above. Regrettably, the majority neglects to mention, much less consider, much of that evidence (see, especially, pars. 3, 4 and 5 of pt. IV., *ante*) and, unjustifiably, in my view, essentially rejects the opinion testimony of Detective Tomlin who concluded, among many other things, that defendant Powers-Monachello was "the ringleader of this operation."

To their credit, my colleagues sum up a good deal of the evidence I have outlined above in this highly pregnant sentence: "Certainly the inference can reasonably be drawn that Powers knew the other defendants, that he was deceptive in his behavior; that he had an arrangement to rent space for the safe, which he often visited; and that the safe was found to contain cocaine for sale." (Maj. opn., *ante*, at pp. 414–415.) But then, and frankly rather startlingly, the majority brushes aside these very correct conclusions with its next sentence: "However, any inferences to be drawn from these facts are limited to Powers." (*Id.* at p. 415) How can this possibly be so when (1) the safe containing the cocaine was at the house occupied by two other codefendants, (2) that house was *regularly entered by Powers without knocking* after each and every trip he made out of Sonoma County, and (3) Powers was friendly enough with one of the residents of that house (Scheiner) to be seen working with the latter on the green BMW at that location? Finally, and most importantly, how can the majority's "limited to Powers" conclusion be deemed even slightly consistent with the law regarding inferences of conspiracy as articulated by this court in *Lipinski*? (See dis. opn., *ante*, at pp. 421–422.)

In conclusion, I note again the phraseology of the *Rayyis* opinion, an opinion relied on extensively by both the majority and defendant and respondent (see maj. opn., *ante*, at pp. 408, 413) and one involving, as here, a preliminary hearing, that "the amount of additional evidence that is required to satisfy the corpus delicti rule (aside from the . . . extrajudicial statements) is 'slight' or 'minimal.' " (*Rayyis, supra*, 133 Cal.App.4th at p. 149.) I believe there clearly was such evidence here.